UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**BILLY HARDEN**                                                                                          **PLAINTIFF**

v.                                              **CASE NO. 4:06-CV-236 GTE**

**METROPOLITAN LIFE INSURANCE COMPANY**                                   **DEFENDANT**

## ORDER

Presently before the Court are the parties' Motions for Judgment on the Record and Defendant's Motion to Dismiss.

**I.      Background**

Plaintiff worked for American Express (now, Ameriprise) as a financial advisor from May 27, 1992, until resigning effective December 31, 1999. He was 62 years old when he resigned. Plaintiff participated in a Long Term Disability Plan ("Plan"), which is an employee welfare benefit plan established pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), administered by Defendant Metropolitan Life Insurance Company ("MetLife").

Plan participants are eligible for LTD benefits if they suffer from a "disability" or "are disabled." The Plan provides:

   For purposes of LTD benefits, totally disabled means:

> • You are completely unable to perform any and every material duty of your own occupation, and you require the regular care and attendance of a doctor, both during the 26 week elimination period and for the first 24 months that LTD benefits are payable

> • After both the elimination period and the first 24 months, you're unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified due to training, education or experience. You also must be under a doctor's care before, during and after the elimination period.

The Plan also provides that MetLife "decides whether your condition qualifies as a total disability based on medical evidence." MetLife, as the plan administrator, holds complete discretion to determine eligibility and entitlement to Plan benefits in accordance with the Plan's terms.

On October 12, 2001, Plaintiff Billy Harden filed suit[1] against American Express Financial Corporation d/b/a American Express Financial Advisors, American Express Financial Corporation (AEFA) Long Term Disability Plan, Metropolitan Life Insurance Company, and John Does 1 through 50, alleging three separate causes of action: (1) the Defendants denied disability benefits in violation of ERISA; (2) the ERISA plan discriminated between employees in violation of Title I of the Americans with Disabilities Act ("ADA"); and (3) a state law breach of contract claim.

In the Court's Order dated August 2, 2000, granting Defendants' Motion for Partial Summary Judgment and dismissing the ERISA claim in the previous action,[2] the Court noted the background facts, which are also applicable to this case:

---

[1] Case No. 4:01-cv-704 GTE

[2] This Court granted Defendant's Motion for Summary Judgment on the remaining ADA and state law breach of contract claims on May 2, 2003, holding that the Plaintiff failed to exhaust his administrative remedies on the ADA claim, and declined to exercise supplemental jurisdiction over the state law breach of contract claim under 28 U.S.C. § 1367(c)(3).

On March 12, 2000, Plaintiff filed a claim for Plan LTD benefits. On the claim form he indicated that his financial advisor position had been "very stressful" and that he was unable to return to work. When requested to describe his present condition as regards limitations on his ability to return to work, he answered: "I have had two heart surgeries (1) 5 by-passes (2) 2 by-passes and a valve replaced. Can no longer tolerate the stress and rigorous regimen associated with financial planning. Became too shaky to fill out clients paperwork." When asked to provide a description of his daily routine, he wrote: "Very limited physical activity–reading." He also opined that he would be unable to return to work: "I will not be returning. Can no longer meet clients needs. Was experiencing fainting spells during consultations and too shaky to do paper work."

On his claim form, the Plaintiff noted that he was under the care of the following physicians: Dr. Charles Barg, a family practitioner; Dr. Charles Fitzgerald, a cardiologist; Dr. Stephen Broughton, a psychiatrist; Dr. David Hicks, a cardiologist; and Dr. William Fiser, a heart surgeon.

In order to determine whether the Plaintiff was "totally disabled" under the Plan definition, MetLife contacted each of the physicians listed on Plaintiff's claim form in an effort to obtain his medical records and other documentation regarding his physical status. Dr. Fitzgerald indicated that he had only seen the Plaintiff once to perform an echocardiogram in association with his application for Social Security disability benefits. Other than the echocardiogram results, Dr. Fitzgerald did not have any medical records pertaining to the Plaintiff. MetLife obtained a copy of the echocardiogram results. Dr. Broughton also indicated that he did not have any medical records pertaining to the Plaintiff.

Dr. Hicks, a cardiologist, provided Plaintiff's medical records and completed an "Attending Physician's Statement" form and a "Physical Capacities Evaluation" form concerning Plaintiff. According to the medical records, the Plaintiff had bypass surgery in 1989 and "subsequently presented with syncope and had developed severe aortic stenosis." In 1998 he had a reoperative coronary artery bypass and his aortic valve replaced. Three months after his second surgery Dr. Hicks noted that the Plaintiff "is doing well and having no problems. He has recovered nicely from [the second surgery]." In July 1999, Dr. Hicks opined that Plaintiff is doing well with no real problems, and is stable from a cardiac standpoint. In September 1999, Dr. Hicks noted that Plaintiff visited his office "just to talk about retirement and possible disability." Dr. Hicks advised that his left ventricle was normal and his valve was functioning normally. Dr. Hicks noted: "He seems to be doing well and I didn't encourage him or discourage him from filing disability."

Six weeks after Plaintiff's resignation, in February 2000, Dr. Hicks determined that the Plaintiff had no anginal symptoms and no syncope. Dr. Hicks surmised that the Plaintiff had no heart failure or angina, and was stable from a cardiac standpoint.

Dr. Hicks performed several tests on the Plaintiff in April 2000 after he had complained of feeling dizzy and shaky. An echocardiogram indicated that there was "normal ejection fraction with mild hypokinesis at the apex. Aortic valve function is normal." A stress echo test revealed "a clinically negative, near-maximum stress echo with less-than-optimal exercise tolerance, no symptoms, and no objective evidence for ischemia." Dr. Hicks concluded:

> [The Plaintiff] is stable from a cardiac standpoint. He has no angina and no congestive heart failure. He has mild left ventricular dysfunction with apical hypokinesis, but a low-normal ejection fraction. His valve function is normal. He has episodes where he feels as if he might have syncope, but he has no frank syncope. The etiology of these episodes is unclear. . . I feel that a heads-up tilt is warranted in this gentleman who is having near-syncopal episodes. Depending on the results of this, we can go further with his dizziness work-up to include neurology evaluation. I think from a cardiac standpoint, other than the heads-up tilt, nothing else needs to be done at this time. He has no objective evidence for ischemia and his aortic valve functions appropriately.

Dr. Eleanor Kennedy conducted a heads-up tilt in May 2000. The results were negative.

On the "Attending Physician's Statement" and "Physical Capacities Evaluation" forms, Dr. Hicks noted that Plaintiff is now able to engage in only limited stress situations. Dr. Hicks noted that Plaintiff's "tremors" prevented him from performing his job duties, and that he had not advised the Plaintiff to return to work. However, Dr. Hicks also indicated that the Plaintiff had only a slight limitation with respect to his cardiac functional capacity. Dr. Hicks estimated that in an eight-hour workday, the Plaintiff could sit for eight hours, stand for two hours, and walk for one hour. Dr. Hicks also opined that: the Plaintiff should not lift anything over twenty pounds, but that he could lift up to twenty pounds occasionally; he was capable of using both hands for grasping, pushing and pulling, but not "fine manipulating"; he could use both feet for repetitive movements; he should not squat, crawl or climb, but could occasionally bend and reach above shoulder level.

Dr. Barg, a family practitioner, also provided Plaintiff's medical records. He had examined the Plaintiff in March 2000, April 2000 and July 2000. Dr.

4

Barg observed some changes in Plaintiff's handwriting consistent with a possible neurological disorder; however, he did not recommend any course of treatment. Dr. Barg placed him on a 24-hour houlter monitor, and gave him Pravachol for his high cholesterol, and Atenolol as a precaution due to his history of cardiac problems. Plaintiff discontinued using Atenolol on his own accord. No discussion pertaining to Plaintiff's alleged near-syncope episodes is included in Dr. Barg's records.

In July 2000 Dr. Barg completed an Attending Physician Statement of Disability form for MetLife. Dr. Barg opined that the Plaintiff suffered from a non-work-related illness, and that he had advised the Plaintiff to cease working. He noted that the Plaintiff suffered from fatigue, heart palpitations, high blood pressure, high cholesterol and syncope. He opined that the Plaintiff could sit for three hours, stand for one hour, and walk for one hour; could reach above shoulder level; and could occasionally lift up to ten pounds. Dr. Barg noted that the Plaintiff was unable to perform fine finger movements with his right hand or push/pull with either hand. Dr. Barg did not expect the Plaintiff to improve, and speculated that his health problems may be caused by a neurological disorder such as Parkinson's disease. In terms of his cardiac function capacity, Dr. Barg placed the Plaintiff in Class 4, the most serious category, as having a "complete limitation." Dr. Barg concluded that because of his heart problems and fatigue, the Plaintiff should not return to work.

Dr. Fiser also completed an Attending Physician Statement of Disability form. He had performed the Plaintiff's second surgery, and noted that Dr. Hicks, as Plaintiff's cardiologist, should be consulted for Plaintiff's medical status and ability to work post-operation.

The Court also noted that MetLife considered a "Vocational Assessment" report done by Robert White,[3] a self-employed "Vocational Rehabilitation Specialist," who conducted a two-hour interview with the Plaintiff before preparing the seven-page report in December 2000. The Court stated:

In the report, after reviewing the Plaintiff's medical records, Mr. White noted Plaintiff's present physical condition:

[The Plaintiff] notes chest discomfort on a daily basis lasting from five (5) minutes up to 30 minutes with ongoing shortness of breath. Has spells in

---

[3] The Court noted that Mr. White is not a medical doctor.

5

> which he goes into a daze, has to sit, lay down or hold onto something.
> With minimal activity notes reduced stamina and endurance with frequent
> bouts of extreme fatigue. Unable to participate in some activities of daily
> living except in a self paced controlled manner. Believes it has affected
> his attention and concentration as well as deadlines with friends, family
> and by extension could [affect] his relationship with co-worker and the
> public.
>
> Though Mr. White determined that the Plaintiff's former position of financial
> planner is sedentary in nature, he concluded that the Plaintiff is disabled under the
> American Express LTD Plan in that he is unable to perform the material duties of
> his job on a full-time basis. Mr. White's determination rested primarily on the
> fact that the Social Security Administration had found the Plaintiff to be disabled
> under the Social Security Act.

On June 2, 2003, Plaintiff filed a notice of appeal of the Summary Judgment and Order of Dismissal granted to all Defendants by the Court. The Eighth Circuit's September 10, 2004, opinion reversed this Court's decision finding that this Court should have applied less deferential sliding-scale standard of review, rather than the normal abuse-of-discretion standard because MetLife's failure to obtain Plaintiff's Social Security records, after leading Plaintiff to believe that it would, amounted to a serious procedural irregularity which raised significant doubts about MetLife's decision. The Eighth Circuit directed this Court to remand the case to MetLife with instructions to reopen the administrative record, obtain and review the Social Security records,[4] and make a new determination of the claim. Consistent with the Eighth Circuit's opinion and mandate, this Court remanded the case to MetLife.[5]

---

[4] As noted by the Court in its previous order, the Plaintiff was awarded Social Security disability. However, the Court also notes that specific provisions regarding individuals approaching retirement age applied in those proceedings.

[5] On July 7, 2005, this Court denied Plaintiff's Motion to Reinstate Breach of Contract Claim stating, "Upon remand, this case administratively terminated." However, the Court instructed Plaintiff that subsequent to a determination by MetLife on Plaintiff's claims, Plaintiff may reopen the proceeding for good cause shown and may request to have its state law claims

"Although the Social Security Administration's determination is not binding, it is admissible evidence to support an ERISA claim for long-term disability benefits." *Riedl v. Gen. Am. Life Ins. Co.,* 248 F.3d 753, 759 n.4 (8th Cir. 2001).  Defendant notes that the Social Security disability file contains some documents which were not in the administrative record filed in the previous action.[6]  Specifically, the report of Dr. Jim Aukstuolis, a psychiatrist who conducted an examination of Plaintiff in conjunction with Plaintiff's application for Social Security disability benefits, was not included.  Dr. Aukstuolis diagnosed Plaintiff with general anxiety and depression.  He listed Plaintiff's prognosis as "fair," and listed the Global Assessment of Function at "Level 50."

Additionally, the Vocational Analysis performed by Jim Evans, an employee of the Social Security Administration was not contained in the previous administrative record.  Mr. Evans stated that Plaintiff retained "the capacity for semi-skilled, light work," as Plaintiff could stand or walk up to six hours a day, and sit up to eight hours a day.  Mr. Evans found that Plaintiff had "the mental capacity to perform work where interpersonal contact is only routine but superficial," which constitutes semi-skilled work.  He further found that Plaintiff could not return to his previous positions as a financial advisor, a skilled, sedentary position, or as a pastor, a skilled, light position, due to mental limitations.  While Mr. Evans stated that Plaintiff's vocational

---

reinstated as pendant to the underlying federal claims.

[6]Defendant also notes that there are medical records considered by this Court in the previous action, which were not contained in Plaintiff's Social Security file, and therefore, were not considered by the Social Security Administration.  More specifically, the Social Security file does not contain records from three of Plaintiff's treating physicians, Dr. Charles Barg, Dr. Charles Fitzgerald, and Dr. Eleanor Kennedy, a cardiologist, and the Attending Physician Statements completed by Dr. Barg, Dr. Fiser, and Dr. Hicks, in which they assessed Plaintiff's physical and mental capabilities.

outlook was "bleak," it appears that he did so under the framework of Social Security Vocational Rule 202.06, which concerns individuals approaching normal retirement age.

Also omitted from the previous administrative record is the Affidavit of Dr. Charles Fitzgerald. Dr. Fitzgerald stated that Plaintiff's cardiac status appeared stable, but that Plaintiff's report of being unable to perform his former work as a financial planner was consistent with his history of bypass surgery. Dr. Fitzgerald based this conclusion on the fact that one out of five individuals having the bypass surgery make similar complaints, and interference with concentration and judgment would preclude Plaintiff from making important financial decisions. However, Dr. Fitzgerald also stated that he had not had the occasion to test Plaintiff's intellectual functioning, and suggested that Plaintiff be tested with appropriate psychometric instruments.

As part of his application for Social Security disability benefits, Plaintiff underwent a Mental Residual Functional Capacity Assessment performed by Dr. Kathryn Gale. Dr. Gale noted moderate limitations in Plaintiff's ability to maintain attention and concentration for extended periods, ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and ability to interact appropriately with the general public. However, Dr. Gale found that Plaintiff was not significantly limited as to the remaining categories. Furthermore, Dr. Gale did not find that Plaintiff was "markedly limited" in any category. She concluded that Plaintiff "is able to perform work where interpersonal contact is routine but superficial, e.g. grocery checker; complexity of tasks is learned by experience, several variables, uses judgment within limits; supervision required is little for routine but detailed for non-routine." Dr. Gale also found that Plaintiff was slightly restricted in performing

activities of daily living, that he had moderate difficulty in maintaining social functioning, and that he often had deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner.

Finally, Plaintiff's Social Security file also contained a Residual Physical Functional Capacity Assessment performed by Dr. Alice Davidson. Dr. Davidson found that Plaintiff could stand or walk about six hours in an eight-hour workday and could sit about six hours in an eight-hour workday.

On June 29, 2005, Plaintiff filed a Motion for Order to Show Cause why Separate Defendant MetLife should not be held in contempt of court. Plaintiff alleged that MetLife had taken no steps toward resolution of the remanded case. Subsequently, MetLife sent Plaintiff a benefits determination letter dated July 12, 2005 denying Plaintiff's claim, which states:

> Prior to making our determination, we had Mr. Harden's entire claim file, including his file from his claim for Social Security Disability benefits, and all other medical records in our file reviewed by Michael J. Rosenberg, MD, an Independent Physician Consultant, Board Certified in Internal Medicine, Cardiology and Interventional Cardiology and Reginald A. Givens, MD, Psychiatrist, an Independent Physician Consultant, Board Certified in Adult Psychiatry and Neurology.[7]
>
> Upon review of the records, Dr. Rosenberg indicated that the records describe Mr. Harden's history of artherosclerosis and treatment for hyperlipidemia. His initial coronary bypass surgery was performed in 1988, for atherosclerotic cardiovascular disease. His cardiac catheterization on December 27, 1988, indicated normal left ventricular ejection fraction, no significant right coronary disease, but a totally occluded and collateralized left anterior descending and complex circumflex disease. He underwent an uncomplicated multivessel bypass surgery.
>
> Over the subsequent years, the records also show that Mr. Harden was followed with exercise stress testing, with preserved left ventricular function and no

---

[7]The record indicates that Drs. Rosenberg and Givens issued their opinions on July 8, 2005.

perfusion abnormalities. Serial echocardiography over the years demonstrated progressive worsening of what was only mild aortic stenosis in 1988. He underwent another surgery in 1998, both grafts to the circumflex system with placement of a pericardial aortic valve. On July 7, 1999, he had no cardiovascular complaints and was being managed with Lopid, gemfibrozil, enalapril and aspirin. He also indicated that he was exercising, playing racquetball, occasional basketball and doing a little weights.

Mr. Harden had an office visit with Dr. Hicks on April 24, 2000, during which he stated he was "not doing any good." He reported feeling shaky and faint at times. He also had complaints of dizziness that might lead to a sensation of passing out. Dr. Hicks reported that he remained stable from a cardiac standpoint and further stated that he had no angina or congestive heart failure. The etiology of the syncopal episode was felt to be unclear. Holter monitoring performed showed simple ventricular ectopy with no complex forms. A recommended heads up tilt test was also normal. An echocardiogram dated April 24, 2000, showed normal ejection fraction with mild hypokinesia at the apex. The aortic valve was described as functioning normally and no other abnormalities were noted.

Dr. Rosenberg concluded that the records do not demonstrate that Mr. Harden experienced a severity of symptoms to support his inability to function in a light to sedentary capacity from his last day worked through the present. The records provided demonstrate that he had good recovery, normal ventricular function, no findings of myocardial ischemia, and good exercise tolerance on post operative exercise testing. Although he reports subjective complaints there is no substantiation of syncope or near syncope caused by a cardiac condition.

Dr. Givens completed a review of the file to determine if Mr. Harden suffered functional impairment from a psychiatric perspective. It should be noted that the records primarily address Mr. Harden's cardiac disease issues. There is a Mental Residual Functional Capacity Assessment dated June 9, 2000, completed by Dr. Gale. Though Dr. Gale concluded that Mr. Harden was able to perform work with interpersonal contacts, these were routine, but superficial, e.g. a grocery [] checker. She does not provide specific mental status examination findings to support her conclusions or specific examples concerning inability to complete a normal workday of interacting appropriately with the general public. There are no follow-up notes from Dr. Gale that would allow for an assessment of progression of symptoms.

On February 24 2000, Mr. Harden underwent a Social Security Evaluation with Dr. Aukstuolis. Dr. Aukstuolis states that Mr. Harden was neatly dressed and groomed, appearing somewhat anxious, but denying any suicidal or homicidal ideations or hallucinations. Mr. Harden was reported as cognitively intact. He

complained of being unable to continue his job because he would become so stressed that [h]e would have periods of blackouts. His thoughts were described as well organized and having no psychotic symptomology. He also complained of having poor concentration and problems with poor sleep and anxiety. On exam he was able to repeat five digits forward and four digits reverse, he was able to recall three out of three objects within five minutes, name five large cities, do serial threes subtractions quickly and easily and able to count form 20 to 1 without problem. The doctors performing the evaluation reported that Mr. Harden was able to communicate effectively and without problems and that he was able to take care of himself, take care of his activities of daily living and was able to manage his own finances. He was given a diagnosis of anxiety disorder, not otherwise specified, and depressive disorder, not otherwise specified.

Dr. Givens concluded that the records do not support objective evidence of cognitive dysfunction and in fact the only records that specifically document objective type testing or mental status exam show normal cognitive functioning. The records also fail to provide evidence that Mr. Harden was receiving continuous treatment for a mental nervous condition.

In conclusion, the records continue to lack objective evidence of Mr. Harden's inability to perform the duties of his own occupation on a continuous basis from January 1, 2000. As such, our prior determination to deny his LTD benefits remains unchanged.

On August 22, 2005, this Court entered an order denying Plaintiff's Motion for Order to Show Cause as moot because MetLife did ultimately re-review Plaintiff's claims, but noting that Plaintiff did not issue its determination letter until nearly two weeks after Plaintiff filed the Motion for Order to Show Cause.

Rather than reopening the case, on February 14, 2006, Plaintiff filed the Complaint[8] in the instant case alleging wrongful denial of benefits and breach of contract.[9] On November 21,

---

[8] Case No. 4:06-cv-00236 GH

[9] Although the Complaint was originally assigned to Judge Howard, this Court treated Plaintiff's Motion to Consolidate as a Notice of Related Case because a closed case cannot be consolidated with an open case and concluded that this case should be assigned directly to the undersigned judge, who handled the previously filed case, because it was a continuation or refiling of the previous case.

2006, this Court denied Defendant's Motion to Dismiss for lack of jurisdiction, noting that Plaintiff contended that he was adding a bad faith argument based upon the post-remand behavior of the Defendant. However, the Court directed Defendant to submit a proper motion to dismiss the state law claims based upon preemption. Defendant filed its Motion to Dismiss the state law claims on January 16, 2007. Subsequently, the parties filed their motions for judgment on the ERISA claims.

**II.    Standard**

An administrator's decision to deny benefits under an employee welfare plan is reviewed *de novo*, unless the benefit plan gives the "administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Brunch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). When the benefit plan gives the "administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the district court's review is for an abuse of discretion. *Id.*; *Clapp v. Citibank, N.A. Disability Plan*, 262 F.3d 820 (8th Cir. 2001). Here, it is undisputed that the Plan provides the administrator such discretionary authority to determine benefit eligibility.

However, the Eighth Circuit has held that "less deference is afforded if the decisionmaker labored under a financial conflict of interest that has 'a connection to the substantive decision reached,' or if a procedural irregularity raises 'serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim.'" *Weidner v. Federal Exp. Corp.*, 492 F.3d 925, 928 (8th Cir. 2007) (citing *McGarrah v. Hartford Life Ins. Co.,* 234 F.3d 1026, 1030-31 (8th Cir. 2000)). Under the conflict of interest test, "some less deferential

standard of review is triggered where the claimant presents "material, probative evidence demonstrating that (1) a palpable conflict of interest . . . existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her." *Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 947 (8th Cir. 2000) (citing *Woo v. Deluxe Corp*, 144 F.3d 1157, 1160 (8th Cir. 1998)). Under the procedural irregularity test, the Plaintiff "must show (1) that a serious procedural irregularity existed, which (2) caused a serious breach of the plan trustee's fiduciary duty to the plan beneficiary." *Buttram v. Central States, Southeast and Southwest Areas Health and Welfare Fund*, 76 F.3d 896, 900 (8th Cir. 1996). If Plaintiff satisfies either two-prong test, the Court will "apply the 'sliding scale' approach of determining just how much less deferential the nature of the plan administrator's conflict warrants [the Court] being to the plan administrator's decision to deny benefits." *Schatz*, 220 F.3d at 947 (citing *Woo*, 144 F.3d at 1161).

Plaintiff argues that this less deferential standard of review should be applied in this case under both tests because MetLife both funds and administers the program and the procedures utilized to adjudicate this case were irregular. As to the procedural irregularity, Plaintiff asserts that according to the internal logs kept by MetLife, no action was taken from the date the case was remanded until Plaintiff filed a motion to hold Defendants in contempt of Court. Plaintiff further asserts that immediately, the case was referred out for a "quick medical opinion" and denied less then two weeks later.

Under the conflict of interest test, "when the insurer is also the plan administrator, the Eighth Circuit has "recognized something akin to a rebuttable presumption of a palpable conflict of interest." *Id.* at 947-48 (citing *Barnhart v. UNUM Life Ins. Co.,* 179 F.3d 583, 587-88 (8th

Cir. 1999)). "Indicia of bias can be negated by 'ameliorating circumstances,' such as 'equally compelling long-term business concerns' that militate against improperly denying benefits despite the dual role." *Id.* at 948 (citing *UNUM Life*, 179 F.3d at 588; *Farley v. Arkansas Blue Cross & Blue Shield,* 147 F.3d 774, 777 (8th Cir.1998)). However, as discussed in *Payzant v. UNUM Life Ins. Co*, 402 F. Supp. 2d 1053, 1061 (D. Minn. 2005), "the Eighth Circuit has also stated that 'not every funding conflict of interest . . . warrants heightened review because ERISA itself contemplates the use of fiduciaries who might not be entirely neutral,' *Tillery v. Hoffman Enclosures, Inc.,* 280 F.3d 1192, 1197 (8th Cir. 2002), and 'it is wrong to assume a financial conflict of interest from the fact that a plan administrator is also the insurer.' *McGarrah v. Hartford Life Ins. Co.,* 234 F.3d 1026, 1030 (8th Cir. 2000)."

"The Eighth Circuit has not definitively determined whether the plaintiff has the burden of producing actual evidence of a financial conflict, or whether the defendant, after the plaintiff has alleged that the defendant is both the insurer and the administrator, has the burden of producing evidence to rebut the presumption of conflict of interest." *Id*. (comparing *McGarrah,* 234 F.3d at 1030, *with Schatz,* 220 F.3d at 947-48, *and Phillips-Foster v. UNUM Life Ins. Co. of America,* 302 F.3d 785, 795 (8th Cir. 2002), *and Torres v. UNUM Life Ins. Co. of America,* 405 F.3d 670, 678 (8th Cir. 2005)). However, "[t]he mere fact of an 'unameliorated' structural conflict of interest does not necessarily warrant a less deferential standard of review." *Id*.

The second part of the gateway test requires the presentation of "material, probative evidence that this palpable conflict of interest actually caused a serious breach of the plan administrator's fiduciary duty to her." *Id*. The Eighth Circuit has noted that the second part of the gateway test "presents a considerable hurdle for plaintiffs." *Id.* (citing *UNUM Life*, 179 F.3d

14

at 588 n.9). "The evidence offered by the claimant must give rise to 'serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim.'" *Id.* (citing at *UNUM Life*, 179 F.3d at 589; *Layes v. Mead Corp.,* 132 F.3d 1246, 1250 (8th Cir.1998)).

Under the procedural irregularity test, the Plaintiff "must show that the plan administrator, in the exercise of its power, acted dishonestly, acted from an improper motive, or failed to use judgment in reaching its decision." *Neumann v. AT&T Comm. Inc*., 376 F.3d 773, 781 (8th Cir. 2004). "The irregularities 'must have some connection to the substantive decision reached,' such that they leave a reviewing court with 'serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim,' or demonstrate that 'the actual decision was reached without reflection and judgment.'" *Id*.

Assuming, without deciding, that Plaintiff has established the first prong of each test, the Court finds that Plaintiff has failed to set forth any evidence to support the second prong of causation as to either test. While Plaintiff's allegation that Defendant failed to take any action related to her case for eight months after remand, and then only acted due to the filing of a contempt motion, gives the Court pause,[10] Plaintiff has failed to demonstrate the connection to the substantive decision reached. The Court notes that the opinions of MetLife's reviewers, Drs. Rosenberg and Givens, indicate a thorough examination of the administrative record. Both

---

[10]The Court notes that Defendant has cured its prior procedural irregularity by reviewing Plaintiff's Social Security records.

reviewers recommended denial of Plaintiff's claim. Therefore, the abuse of discretion standard applies.[11]

### III. Motions for Judgment

"Review of an administrator's decision under an abuse of discretion standard, though deferential, is not tantamount to rubber-stamping the result." *Torres v. UNUM Life Ins. Co. of America*, 405 F.3d 670, 680 (8th Cir. 2005). "On the contrary, [the Court] review[s] the decision for reasonableness, which requires that it be supported by substantial evidence that is assessed by its quantity and quality." *Id*. This review employs five factors:

> (1) whether the administrator's interpretation is consistent with the goals of the Plan; (2) whether the interpretation renders any language in the Plan meaningless or internally inconsistent; (3) whether the administrator's interpretation conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the administrator has interpreted the relevant terms consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

*Id*.

"The proper inquiry under the deferential standard is whether 'the plan administrator's decision was reasonable; i.e. supported by substantial evidence.'" *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997). "While the word 'reasonable' possesses numerous connotations, this Court has rejected any such definition that would 'permit a reviewing court to reject a discretionary trustee decision with which the court simply disagrees[.]'" *Id.* The decision will be deemed reasonable if "a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would*

---

[11] The Court notes that even if it had applied a less deferential standard of review, the Court would still find that Defendant met its burden in this case.

have reached that decision." *Id.* "If the decision is supported by a reasonable explanation, it should not be disturbed, even though a different reasonable interpretation could have been made." *Id.*

After a thorough review of the record in this case, the Court finds that Defendant MetLife's decision to deny Plaintiff LTD benefits under the Plan was not an abuse of discretion. The decision of the Defendant was supported by substantial evidence and the decision offered a reasoned explanation based upon the evidence. In the initial action, the Court found that there was substantial evidence in the administrative record to support MetLife's determination. The Court agrees with Defendant's contention that nothing from the Social Security disability file changes this finding.

The report by Dr. Aukstuolis does not support Plaintiff's claim of disability, as it states that Plaintiff's prognosis is "fair," and Plaintiff was "cognitively intact." Furthermore, the opinion of Jim Evans, who concluded that Plaintiff retained "the capacity for semi-skilled, light work," and Plaintiff's vocational outlook was "bleak," did so under the framework of Social Security Vocational Rule 202.06, which concerns individuals approaching normal retirement age. Although Plaintiff heavily relies on the affidavit of Dr. Fitzgerald, the affidavit merely indicates that Plaintiff's report of being unable to perform his former work as a financial planner is *consistent with* his history of bypass surgery. He makes no conclusion that this is actually the case. Rather, he suggests testing with appropriate psychometric instruments.

Dr. Davidson's findings also support MetLife's conclusion. While Plaintiff asserts that Dr. Givens, one of the reviewers for MetLife, concluded that Plaintiff could only do low stress work such as that of grocery checker, the Court finds no such conclusion by Dr. Givens. Rather,

17

Dr. Givens noted Dr. Gale's conclusion that Plaintiff could only do low stress work. The Court also notes that Dr. Givens points out that Dr. Gale does not provide specific mental status examination findings to support her conclusions or specific examples concerning the inability to complete a normal workday of interacting appropriately with the general public. Additionally, Dr. Givens notes that there are no follow-up notes to allow for an assessment of progression of symptomatology.

Additionally, on February 10, 2000, Dr. Hicks reported that Plaintiff has no syncope and no anginal symptoms, although the report states that Plaintiff needed stress testing. On April 24, 2000, Dr. Hicks performed a clinically negative, near-maximum stress echo with less-than-optimal exercise tolerance, no symptoms and no objective evidence for ischemia. Dr. Hicks also noted that Plaintiff had no frank syncope. Dr. Hicks recommended a heads-up tilt, which was conducted by Dr. Eleanor Kennedy in May 2000. The results were negative.

Although Plaintiff argues that MetLife erred in insisting upon objective medical evidence, "[i]t is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence." *Pralutsky v. Metropolitan Life Ins. Co.*, 435 F.3d 833, 839 (8th Cir. 2006) (citing *Coker v. Metropolitan Life Ins. Co.*, 281 F.3d 793, 799 (8th Cir. 2002) (finding denial of benefits not unreasonable where objective medical evidence did not support claimant's contention that he was disabled by diabetes and syncopal episodes).

As stated above, the Court concludes that MetLife's decision to deny LTD Plan benefits was not an abuse of discretion, as a reasonable person could have concluded that Plaintiff was not "totally disabled" and unable to perform his duties as a financial planner given the evidence

before him. Therefore, summary judgment in favor of the Defendant on the ERISA claim is warranted.

**IV.     Motion to Dismiss**

In its Motion to Dismiss, Defendant asserts Plaintiff's state law breach of contract and breach of the implied covenant of good faith and fair dealing should be dismissed because they are preempted by ERISA. Additionally, Defendant asserts that there is no cause of action for breach of the implied covenant of good faith and fair dealing, and Plaintiff waived any cause of action for breach of contract or the implied covenant of good faith and fair dealing.

Defendant states that the Eighth Circuit has "consistently held that state law causes of action are completely preempted by ERISA when they 'arise from the administration of benefits.'" *Fink v. Dakotacare*, 324 F.3d 685, 689 (8th Cir. 2003) (holding state law claims for breach of contract and claims under the South Dakota unfair insurance practices statute were preempted). The Court notes that Plaintiff filed no response to the motion. Defendant's motion will be granted.

Accordingly,

IT IS HEREBY ORDERED THAT Defendant's Motion for Summary Judgment (Docket No. 22) shall be, and it is hereby, GRANTED.

IT IS FURTHER ORDERED THAT Plaintiff's Motion for Summary Judgment (Docket No. 27) shall be, and it is hereby, DENIED.

IT IS FURTHER ORDERED THAT Defendant's Motion to Dismiss Plaintiff's Causes of Action for Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing (Docket No. 18), shall be, and it is hereby, GRANTED.

IT IS SO ORDERED THIS 27th day of September, 2007.

     /s/ Garnett Thomas Eisele
UNITED STATES DISTRICT JUDGE